STATE OF MAINE *vs.* JOHN F. LAWRENCE.

Every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved.

To establish a defense on the ground of insanity, the burden is on the defendant to prove, by a preponderance of evidence, that at the time of committing the act, he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he *did*, that he did not know he was doing what was wrong; partial insanity, if not to the extent above indicated, will not excuse a criminal act.

When the defendant, in a criminal case, does not testify as a witness in his own behalf, it is not improper for the presiding judge, in his charge to the jury, to call their attention to the fact, and to instruct them, that it is a circumstance proper for their consideration.

ON EXCEPTIONS.

INDICTMENT FOR MURDER.

It appeared, on the part of the government, that Elmira Atwood had been living at the house of one Mrs. Marsh, on Hammond

street, Bangor, some four weeks prior to the murder; that the defendant, Lawrence, went there more or less; that on Saturday, January 1, 1870, he went there considerably intoxicated, conversed with Elmira Atwood, and called her by an opprobrious epithet, she answering, that if he called her that, she would make him prove it, whereupon he went away without any reconciliation taking place between them at that time; that on the next (Sunday) evening he went there again; that he, living by himself on Main street, and Mrs. Marsh having been in the habit of preparing food for him, handed her a little tin pail and requested her to put up some hashed fish; that he asked Mrs. Marsh if she were alone; that Mrs. Atwood had gone into a little bedroom; that after Mrs. Marsh went into the pantry, Lawrence went into the bedroom, where he saw Mrs. Atwood; that Mrs. Marsh heard voices talking, but could not understand what was then said until she heard Mrs. Atwood say, "I will, I will, I will, John;" that when Mrs. Marsh came out of the pantry, she saw Mrs. Atwood coming out of the bedroom, Lawrence having already come out and gone across the kitchen, facing the door as if going out; that Mrs. Atwood said, "Oh, the pistol! the pistol!" and came near fainting; that Lawrence turned round, drew out his pistol, and without taking any more aim than merely raising his arm and pointing, it toward Mrs. Atwood, fired twice; that Mrs. Atwood fell; that Mrs. Marsh rushed out of the house, and heard two more pistol shots, at least, fired after she went out; and that Lawrence passed Mrs. Marsh, going out of the house as she returned.

It also appeared from the testimony of the attending surgeon, that Mrs. Atwood had three bullet-wounds, one of which was in the right side, between sixth and seventh ribs, through the liver and intestines; and that she died from the wound in about forty-eight hours after the wound was received.

It also appeared, that about seven o'clock on the same Sunday evening, Lawrence was found in his room, on Main street, with his throat cut; that he still had a knife in his hand; that when found, his first words were, "Do you think I am cut enough to die?" "Is

that damned whore dead?"   "I hope she is.   If she is, I can die happy."

It also appeared, that the defendant was jealous of Mrs. Atwood, who, he alleged, had agreed to marry him, and then went with other men.

The defense was insanity, and considerable testimony tending to show the condition of Lawrence at the time of shooting Mrs. Atwood, and before and afterwards, was introduced.

The presiding judge, *inter alia*, charged the jury as follows:

"Was it a case of jealousy, or was it an insane delusion?   You are to determine whether insanity of any kind existed at the time of the homicide.   If it is not established, then the defense of insanity fails, and the case stands upon the facts.

"If you find a general or partial insanity, then what is the rule? If you take the monomania upon the subject of the woman, as he expresses it, "going back upon him," if there was an insane delusion upon that subject, then how far did that excuse him for the killing?   Suppose he was insanely jealous, it would not necessarily follow, that he should not know it was not right for him to kill her.

"But if it is shown that he not only had an insane delusion on that subject, but that he supposed he had a right to kill her, that covers the whole.   But the mere fact that a man is jealous with cause, does not justify him in killing a woman, if she is his lawful wife.   So if he is insane with a monomania, he is not justified in killing her, unless it is shown that he had a faith that it was right for him to do it, and had lost all sense of responsibility for it.   I have now reached the point where I can give you the general instructions that I intended.

"To excuse a man from responsibility on the ground of insanity, it must appear, that at the time of doing the act he had not capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he was doing.   That he had not knowledge, consciousness, or conscience enough to know, that the act he is doing is a wrong act, and a criminal act, and one that he will be subject or liable to punishment for doing.   In order

to be responsible, he must have sufficient mind and memory to understand and remember the relation he stands to others, and others to him, and that the act he is doing is contrary to the plain dictates of right, wrongfully injurious to others, and a violation of the dictates of duty. If there be partial derangement, or insanity of mind, so that it is not in all respects perfectly sane and sound, yet if not to the extent above indicated, it will not excuse a criminal act. In other words, a man may be a monomaniac, his mind may be disordered, and, to a certain extent, it may be proved that he is of unsound mind, and yet, if he has mind and understanding enough, and is not carried away so but that he understands the difference between right and wrong, as to the act he is then doing,—that is to say, if the man knew that what he was doing was wrong, and he was liable to be punished for it, and that the act would not be excused, then he is subject to punishment, although there might be some partial derangement.

" But if he does not understand the relation of parties, as, for instance, where a son killed his father, and was so deranged that he did not know it was his father, he could not be responsible. But if the party feels and knows that he is doing wrong, although he may have wrought himself up by hatred and jealousy, to a determination to kill, yet if it appears that at the time he had capacity sufficient, and did know he was doing wrong, as before explained, he would not be excused. The rule is as I have stated. If there be a partial insanity, yet if it is not proved he was insane and unsound, to the extent I have stated, it will not excuse criminal acts.

" I am requested, by the counsel, to give some instructions.

1. " That if, at the time of the commission of the act, the defendant was under the influence of an insane delusion, impelling him to the commission of the act for which he had no rational motive, notwithstanding he may have appeared able to distinguish right from wrong, they shall find for the defendant on the ground of insanity.

" On that request I will say, if he was under an insane delusion, it would be a defense if the act, under that delusion, would be justifiable in assuming the delusion to be a fact. If he acts under

the delusion, for instance, that he has a right to kill, then he is justifiable ; but if he acts under another delusion, not the cause, then he may not be.

" For instance, take the case of Abraham offering up his son Isaac. There he had a special commission to do it ; he had faith, and believed it was the command of God, and was about to do it.   Now suppose some gentleman here should think he heard, in the night, a voice coming to him distinctly and audibly, and saying, ' Take your son and build a pile and sacrifice him,' and he fully believed it, and took his little son and carried him out the next day, and actually sacrificed him.

" There, insanity would be fully proved, because he actually believed it as much as Abraham believed that it was the commandment of the Almighty.   A thing would be excused from delusion, where it would be excused if that delusion were true, as before explained.

" I do not think that the evidence, in this case, calls upon me to give any ruling as to a case of blind, unreasoning impulse to take life, irrespective of motive as to the person assaulted, and having no connection with any existing relation between the assailant and the assailed, which impulse overcomes reason, power of the will, conscience, and all fear of consequences, and all power to resist the impulse to kill, although the person might not be shown to have lost all sense of right and wrong.   That would be like cases read by the counsel for the defense, in his very clear and able opening. A French woman had a desire to kill young children,—an insane desire to kill, without any jealousy, and without any occasion whatever.   There have been cases of that kind, and it is a question how far that impulse might excuse.   I think there is nothing of the kind shown in this case.

2.  " That in capital cases the prosecution must prove the felonious killing, and if the jury have a reasonable doubt of the murder, the verdict must be for acquittal.

3.  " That the plea of insanity does not deprive the accused of the benefit of this principle of law, and does not relieve the govern-

ment from proving, beyond a reasonable doubt, the guilt of the prisoner."

On these requests the judge said he had already given them in his charge, but would repeat the substance of what he had said, viz., That the government was not relieved from proving the guilt of the accused beyond a reasonable doubt by such plea, or on any other ground; but if it had proved beyond such doubt, all that was required to constitute the offense charged before any evidence of insanity was offered; that insanity must be established by a preponderance of evidence, as before fully stated and explained in the charge.

4. " That where insanity is offered in defense, it is not necessary for the prisoner to prove his insanity by a preponderance of testimony, but, on the contrary, if the jury find a reasonable doubt of the sanity at the time of the commission of the act, there must arise in their minds a doubt of the malice, which alone constitutes murder."

By the court. " I give you no other ruling than what I have given you before."

5. " In this case, where insanity is set up as a defense, the court is requested to instruct the jury, that they are to be satisfied, from all the testimony in the case, beyond a reasonable doubt, of the guilt of the prisoner, and if they have a reasonable doubt of his sanity, they are bound to acquit."

No new instruction was given under this request.

6. " Will the court also instruct the jury, that if they find that at the time of the commission of the act, the defendant was laboring under an insanity which would excuse him from legal responsibility for its commission, they will render a verdict of acquittal, whether or not they are satisfied as to the causes which produced the insanity, or its particular form."

The judge stated, in regard to this request, that he had already instructed the jury, that if the prisoner was laboring under insanity at the time of the commission of the act, sufficient to excuse him, they will acquit him whatever may be the cause of the insanity, or whether ascertained or not.

The judge then proceeded as follows: " There is only one other thing I wish to call your attention to, and I think it is my duty to say a word upon it. That is the non-production of the prisoner, as a witness in this case. It is only a few years since the prisoner was allowed to testify in criminal cases. The law has been altered, giving the prisoner the privilege of testifying if he chooses. He is not bound to testify to anything criminating himself, or bearing on the case. But if he is not put upon the stand, you must necessarily understand and know the fact, that he is not put upon the stand to state his knowledge to the jury. The jury would not be bound to and should not convict simply on the ground that the prisoner does not testify. But it is a fact in the case, more or less potent or important, as you may consider it. In this case the counsel say the plea being insanity, they did not propose to put on the prisoner himself. Ordinarily, where insanity is alleged to have continued, if he was a crazy man when tried, this suggestion would have more weight than when not laboring under insanity at the time of the trial. While he was not obliged to go on, you are not to draw forced inferences. Perhaps he might have explained his conduct more fully, but he chose to rely upon the evidence presented. At all events, it is for you to consider that he did not choose to go on to the stand, and the government say there are many facts that he might have explained."

The jury returned a verdict of guilty of murder in the first degree ; and the defendant alleged exceptions.

*A. Knowles & John F. Godfrey*, for the defendant, cited, *Commonwealth* v. *York*, 9 Met. 93, dissenting opinion ; *United States* v. *Mingo*, 2 Curtis, 2 ; *Commonwealth* v. *Hawkins*, 3 Gray, 463 ; *Powers* v. *Russell*, 13 Pick. 69 ; *Delano* v. *Bartlett*, 6 Cush. 364 ; *Tourtellot* v. *Rosebrook*, 11 Met. 460 ; *Morrison* v. *Clark*, 7 Cush. 313 ; *Sawyer* v. *Spofford*, 4 Cush. 598 ; *Lane* v. *Crombie*, 12 Pick. 177 ; *Commonwealth* v. *McKie*, 1 Gray, 61; *United States* v. *McClare*, 7 Law Rep. (N. S.), 439; 1 Ben. & Heard's Lead. Cr. Cas. 253 ; *State* v. *Merrick*, 19 Maine, 398; *State* v. *Flye*, 26 Maine, 312 ; *Tarbox* v. *East. Steamboat Co.*, 50 Maine, 345 ; 4

Blackstone's Com. 195 ; *Gerrish* v. *Mason*, 22 Maine, 438 ; *Loring* v. *Aborn*, 4 Cush. 608 ; *Harrison* v. *Edes*, 15 Mass. 347 ; *State* v. *Crowell*, 25 Maine, 171 ; *State* v. *Woodward*, 34 Maine, 293 ; *State* v. *Churchill*, 25 Maine, 306 ; 1 Ben. & Heard's Lead. Cr. Cas. 353.

*W. P. Frye*, attorney-general, *contra.*

DANFORTH, J. The instructions and refusals to instruct, in relation to the responsibility of the insane, complained of in the first exception, are in strict conformity to the most approved judicial authorities. *United States* v. *Holmes*, 1 Clifford, 117 ; *Commonwealth* v. *Rogers*, 7 Met. 500, and cases cited. It is possible that the increased knowledge of the nature and effects of insanity, may, in appropriate cases, require instructions more in harmony with the requests in this case. But, however this may be, a careful examination of the testimony, which is reported in full, shows that this is not one of those appropriate cases, and that the respondent is not, in any legal sense, aggrieved by the instructions given or withheld upon this point.

So of the last instruction excepted to, if such it may be called. It would seem to be rather a suggestion of a fact already existing in the case, than a ruling in a matter of law. That the prisoner did not go upon the stand is a fact in the case, and is made no more or less so, simply because the presiding judge saw fit to call the attention of the jury to it.

It could hardly have escaped the notice of the jury if the judge had not alluded to it in his charge. It will exist in every case, so long as the act permitting parties to testify remains the law, unless the party himself chooses to make it otherwise. It will, too, have its legitimate effect upon the minds of the jurors, more or less convincing according to the circumstances of each case, whatever may be the ruling of the court in regard to it. Belief is controlled by principles more potent in their action than artificial rules of evidence. When a person has an opportunity to testify in relation to a matter of which he has knowledge, and in which he is deeply

interested and refuses to do so, such refusal will have its weight, modified only by the accompanying circumstances. We act upon such testimony constantly. It is the instinct of our nature, and will not be eradicated by the ruling of any court. If this leads to injustice, the wrong is inherent in the law permitting parties to testify, and the remedy is with the legislature alone.

The remaining question, as to the burden of proof in criminal cases, where insanity is set up as a defense, is one of much more difficulty, though until recently the authorities seem to have been uniform in imposing it upon the defendant. Quite lately doubts have been suggested, and, in a few instances, judicial tribunals, entitled to the highest respect, have come to a conclusion the reverse of the former decisions. As a matter of principle the question lies in a very narrow compass. The difficulty is in the starting-point, in determining the premises. These being once settled the conclusion is evident. Those who maintain that the burden is upon the prosecutor, contend that sanity is an elemental part of the crime, and is a necessary part of its definition, and as such the jury must have the same satisfaction of its truth as of any other part. It is undoubtedly true, that there can be no guilt except as the result of the action of a sound mind, there can be no crime except there be a criminal; nevertheless, there is a palpable distinction between these two; one cannot exist without the other, still they are two and not one and the same. The person doing the act is not the act itself. He may or may not be responsible for the act, but in no sense can he be the act. So, too, whether he committed the act is one question, and whether he is responsible for that act is another and entirely different question. Now it should not be forgotten that we start with the legal presumption that all men are sane and responsible for all their acts,—in other words, that no man is insane and irresponsible, precisely as we do with the proposition that no man has legal authority for doing that which otherwise would be a crime or a trespass. Hence the statute defines murder to be "the unlawful killing of a human being, with malice aforethought, either express or implied." Here are all the elements necessary to con-

stitute the crime assuming a responsible agent. Not one word as to what is, or is not required to make him responsible. And so of all other statute definitions, whoever shall do the certain acts set out, shall be guilty. Here, as everywhere in the law, sanity is assumed and treated as an essential attribute of humanity. The indictment follows the statute, setting out all the acts deemed essential to the crime, but omitting all reference to the capacity of the accused. Of all that is set out in the indictment he is presumed innocent, and that must be proved and nothing else. When that is proved he is convicted, unless he interposes some defense other than a sane denial of the allegations against him. A simple plea of not guilty, puts in issue the allegations and only the allegations in the indictment, and as to them the prosecution has the affirmative. But if the accused would put in issue any other allegation, any question as to his capacity or responsibility, he must do it by an affirmative statement. If he puts in the plea of insanity, he assumes the affirmative, he changes the issue. And it is immaterial whether it is in writing or merely verbal; in either case it just as effectually raises a new issue. It is true it may be resorted to in connection with the plea of not guilty, but it is not and cannot be a part of it. The plea of insanity is, and of necessity must be, a plea of confession and avoidance. It does not deny a single allegation in the indictment, but simply says, grant all these allegations to be true, that all these acts have been done, and still guilt does not follow, because the doer of them is not responsible therefor. It does not meet any question propounded by the indictment, but raises one outside of it. It is not a mere denial but a positive allegation. It is, however, said in the argument that the plea of insanity does deny the allegation of malice, because the insane is not capable of such a state of the mind. If the term malice is used in the common meaning of that word, it is not necessary now to discuss the question as to how far those who are insane, may or may not indulge it, though it may well be doubted whether, in many instances, a person may not be so unsound in mind as to be irresponsible, and yet be actuated by malice as implying hatred. But

however this may be, he may have malice in the legal and techni-cal sense, or he may be so wilful and deliberate in his action, that the law, in the absence of proof of insanity, will conclusively infer malice. When insanity is found, it does not show that the act was any less willful, or deliberate, or intentional even ; but it does show an excuse, an irresponsibility for what would otherwise have been criminal. So here, as in other respects, the plea of insanity does not deny, but avoids ; confesses this element as well as the others, but excuses. It would seem, then, that the question of insanity can never be raised, unless by the prisoner; and by him only in an af-firmative allegation, such as carries with it the burden of proof.

Every man is presumed to be innocent. This presumption stands till every reasonable doubt is removed. The law presumes every man sane. Why should not this presumption stand till removed by at least a preponderance of evidence? Does it not, and must it not necessarily still stand, though we may have some doubts of its truth? That which exists is not destroyed simply because it may be enveloped in a thin cloud. However we may theorize, it will still exist until demolished. If this presumption is to be overthrown by a doubt, as well might it be abolished at once, and leave the question of sanity, like that of malice, to be proved by the govern-ment or [implied from the circumstances of each case. But this presumption cannot be abolished. It is inherent in human nature, and will exist as long as rationality is an attribute of man, and exist-ing, it should have some meaning, some force; enough, at least, to enable it to withstand something more than a reasonable doubt.

In *Commonwealth* v. *Mackie*, 1 Gray, 61, is very clearly stated the limits of the burden of proof in criminal cases as resting upon the government, where the issue is raised by a simple denial of the allegations in the indictment. It is there held that " where the de-fendant sets up no separate independent fact in answer to a crimi-nal charge, but confines his defense to the original transaction charged as criminal, with its accompanying circumstances, the bur-den of proof does not change, but remains upon the government to satisfy the jury that the act was unjustifiable and unlawful." It is

further said in the opinion, "there may be cases, when a defendant relies on some distinct, substantive ground of defense to a criminal charge, not necessarily connected with the transactions on which the indictment is founded (such as insanity, for instance), in which the burden of proof is shifted upon the defendant."

In the more recent case of *Commonwealth* v. *Eddy*, 7 Gray, 583, where the question as to the effect of the plea of insanity came directly before the court, it was held that the burden of proof was upon the defendant, and that he must satisfy the jury of his insanity by a preponderance of evidence.

In accordance with this authority, are many others entitled to great respect. *United States* v. *Holmes*, 1 Clifford, 117. Wharton's Am. Crim. Law, § 16, 7, 11, and cases cited. 2 Greenl. on Ev. § 373, and notes.

But in this matter, we are not left to the principles of the common law alone. Our statute law, by implication, at least, leads to the same conclusion. By the R. S., 1859, c. 137, § 2, it is provided, that "when the grand-jury omits to find an indictment against any person arrested by legal process to answer for any offense by reason of insanity, they shall certify that fact to the court; and when a traverse jury, for the same reason, acquits any person indicted, they shall state that fact to the court when they return their verdict." And, in either case, he is to be restrained in prison or the insane hospital till restored to his right mind, or delivered according to law. It can hardly be supposed that the legislature expected or intended that the jury should return as a fact the insanity of the prisoner when they have only a reasonable doubt of his sanity, or that he should be detained in custody till restored to his right mind, when there is not sufficient proof to make even a *prima facie* case that he is otherwise than sane. Our conclusion is, that upon this point, as well as upon the others, the ruling was sufficiently favorable to the prisoner.    *Exceptions overruled.*

APPLETON, C. J.; CUTTING, WALTON, and DICKERSON, JJ., concurred.